ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 14 2015

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

-------------------------------------------------- X

UNITED STATES OF AMERICA, the
STATE OF GEORGIA *ex rel.,* JOHN
DOE and JOHN ROE,

                      Plaintiffs,

     V.

CREATIVE HOSPICE CARE, INC.,
CREATIVE HOSPICE HOLDING LLC,
CREATIVE HOSPICE & PALLIATIVE
CARE OF ARIZONA, LLC,
HOMESTEAD HOSPICE
MANAGEMENT, LLC, HOMESTEAD
PALLIATIVE CARE, INC.,
HOMESTEAD HOSPICE OF
AUGUSTA, LLC, HOMESTEAD
HOSPICE OF BLAIRSVILLE, LLC,
HOMESTEAD HOSPICE OF
CARTERSVILLE, LLC, HOMESTEAD
HOSPICE OF CENTRAL GEORGIA,
LLC, HOMESTEAD HOSPICE OF
NORTH AUGUSTA, LLC,
HOMESTEAD HOSPICE OF
NORTHWEST GEORGIA, LLC,
HOMESTEAD HOSPICE OF
CAHABA, LLC, HOMESTEAD
HOSPICE OF SOUTHWEST
ALABAMA, LLC, HOMESTEAD
HOSPICE OF SOUTHERN
ALABAMA, LLC, HOMESTEAD
HOSPICE OF CHARLESTON, LLC,

Civil Action No. 1:15-cv-0840-TWT

**Filed Under Seal
Pursuant to
31 U.S.C. § 3730**

HOMESTEAD HOSPICE OF          :
COLUMBIA, LLC, HOMESTEAD      :
HOSPICE OF FLORENCE, LLC,     :
HOMESTEAD HOSPICE OF          :
GREENVILLE, LLC, HOMESTEAD    :
HOSPICE OF SPARTANBURG, LLC,  :
and MAHLEGA ABDSHARAFAT,      :
                             :
                 Defendants.  :
                             :
----------------------------------------------------

### **FIRST AMENDED COMPLAINT OF THE UNITED STATES**

The United States of America (the "United States") and the State of Georgia

("Georgia) (the United States and Georgia are collectively referred to herein as the

"Government"), by and through their *qui tam* Relators, John Doe ("Relator 1") and

John Roe ("Relator 2"), bring this action under the Federal False Claims Act, 31

U.S.C. § 3729-3733, *et seq.* (the "False Claims Act" or "FCA") and the Georgia

False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.* (the "Georgia False

Medicaid Claims Act") against Creative Hospice Care, Inc., Creative Hospice

Holding LLC, Creative Hospice & Palliative Care of Arizona, LLC, Homestead

Hospice Management, LLC, Homestead Palliative Care, Inc., Homestead Hospice

of Augusta, LLC, Homestead Hospice of Blairsville, LLC, Homestead Hospice of

Cartersville, LLC, Homestead Hospice of Central Georgia, LLC, Homestead

Hospice of North Augusta, LLC, Homestead Hospice of Northwest Georgia, LLC,

Homestead Hospice of Southwest Alabama, LLC, Homestead Hospice of Southern Alabama, LLC, Homestead Hospice of Cahaba, LLC, Homestead Hospice of Charleston, LLC, Homestead Hospice of Columbia, LLC, Homestead Hospice of Florence, LLC, Homestead Hospice of Greenville, LLC, Homestead Hospice of Spartanburg, LLC (collectively, "Homestead" or the "Company") and Mahlega Abdsharafat ("Abdsharafat") (Homestead and Abdsharafat are collectively referred to herein as "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the Government and the Relators, and for their complaint allege:

1.      Based on the Relators' personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act, 31 U.S.C. § 3729, by submitting fraudulent bills to the Government (and/or through their conduct in causing others to submit fraudulent bills to the Government) as a result of: (i) offering and paying kickbacks in exchange for patient referrals in violation of the Anti-Kickback Statute and the Stark Law; (ii) providing and billing the Government for continuous care to patients who are not qualified to receive such care; and (iii) improperly providing inducements to patients and their families to ensure their cooperation and falsifying documents to conceal their fraud.

## PARTIES

2.      John Doe ("Relator 1") worked at Homestead, as a marketer, from April of 2012 until August of 2012.  Relator 1 worked under the supervision of Relator 2.

3.      John Roe ("Relator 2") worked at Homestead from 2010 until 2012 as Regional Director of Marketing.

4.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare").

5.      The State of Georgia administers the Medicaid program to eligible beneficiaries.  The State of Georgia brings claims for Defendants' violations of the Georgia False Medicaid Claims Act, as set forth in detail in Count II, below.

6.      Defendant Homestead is a provider of hospice services.  Homestead is headquartered at 10888 Crabapple Road, Roswell, GA 30075, and has nine locations in the state of Georgia.  Homestead also has two locations in South Carolina, three locations in Alabama, and two locations in Arizona.  All of the entities named as defendants in this action do business under the name "Homestead Hospice" and are referred to as such or as "Homestead" herein.  Relators allege that the conduct

described herein is occurring at all of Defendant Homestead's locations.

7.    Defendant Abdsharafat is the Chief Executive Officer of Homestead and its related entities, and orchestrates its fraudulent activities.  Ms. Abdsharafat appears to have used several other names, including Mahlega Abdesharafat and Mallie Sharafat.

## JURISDICTION AND VENUE

8.    Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

9.    The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq*, and complained of herein took place in part in this District, and the Defendants transacted business in this District as described herein.

10.    Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the complaint on the Attorney General of the United States, and the United States Attorney for the Northern District of Georgia, as well as a statement of all material evidence and information currently in their possession and of which they are the original source.  These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants'

false claims.  Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

### *The False Claims Act*

11.    The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

7

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

12.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

***The Georgia False Medicaid Claims Act***

13.    The Georgia False Medicaid Claims Act imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivers, or causes to be delivered, less of such property or money;

(5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid

program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

O.C.G.A. § 49-4-168.1.

14.    Any person who violates the Georgia False Medicaid Claims Act "shall be liable to the State of Georgia for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person." *Id.*

15.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to the State of Georgia.

### *The Anti-Kickback Statute and Stark Law*

16.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS") provides, *inter alia*, that it is illegal to offer or pay any remuneration (or to solicit or accept any remuneration) in exchange for referring a patient for an item or service reimbursable under any federal health care program (such as Medicare or Medicaid).  *See* 42 U.S.C. § 1320a-7b.

17.    The Stark Law, 42 U.S.C. § 1395nn *et seq.* ("Stark Law"), prohibits physicians from referring patients for Medicare or Medicaid covered services to an entity with which the physician (or a family member of the physician) has a financial relationship (such as ownership, investments, or other compensation arrangements).

## FACTUAL BACKGROUND

## I.    Overview of Medicare and Medicaid and their Benefits

18.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

19.    The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid") is a government insurance program for persons of all ages whose income and resources are insufficient to pay for health care.  Medicaid is the largest source of funding for medical and health-related services for people with low income in the United States. It is a means-tested

program that is jointly funded by the state and federal governments and managed by the states.

20.    HHS and CMS, administer Medicare and Medicaid.  Medicare Parts A and B cover home health services furnished to Medicare beneficiaries. *See* Social Security Act, §§ 1814(a)(2)(C) and 1835(a)(2)(A), 42 U.S.C. §§ 1395f(a)(2)(C) and 1395n(a)(2)(A).  Part A covers home health services beginning within 14 days of a discharge from a hospital or skilled nursing facility. Social Security Act, § 1861(tt), 42 U.S.C. § 1395x(tt), and CMS, Medicare Benefit Policy Manual, Pub. 100-02, ch.7, § 60.1.  Part B covers home health services not related to an inpatient stay. Social Security Act, § 1832(a), 42 U.S.C. § 1395f(a), and CMS, Medicare Benefit Policy Manual, Pub. 100-02, ch. 7, § 60.3.

21.    The Medicare hospice benefit was established by Congress in 1982. The hospice benefit is intended to provide palliative care to individuals who have six months or less to live and who elect to forgo further curative treatment of a terminal illness. Today, Medicare is the predominant source of payment for hospice services. According to the National Hospice and Palliative Care Organization ("NHPCO"), in 2012, as compared to other payment sources, nearly 84% of hospice patients were covered by Medicare. In 2011, Medicare paid $13.7 billion for hospice care for 1.2 million beneficiaries.

22.    To be eligible for Medicare's hospice benefit, federal law requires that a beneficiary be covered by Medicare Part A and be certified as having a terminal illness with a life expectancy of six months or less if the disease runs its normal course. *See* Social Security Act, §§ 1814(a)(7)(A) and 1861(dd)(3)(A); 42 C.F.R. §§ 418.20 and 418.22.  Certification for hospice services occurs when a physician completes a Certification of Terminal Illness for the patient. Specifically, the first 90-day period of hospice care begins once the individual's attending physician (as defined in § 1861(dd)(3)(B) of the Social Security Act), and the medical director (or physician member of the interdisciplinary group described in § 1861(dd)(2)(B)) of the hospice program providing (or arranging for) the care, each certify in writing, at the beginning of the period, that the individual is terminally ill (as defined in § 1861(dd)(3)(A)), and based on the physician's or medical director's clinical judgment has six months or less to live if the individual's illness were to run its normal course. *See* Social Security Act § 1814(a)(7).  There are four levels of care under the Medicare hospice benefit: (1) routine home care; (2) respite care; (3) general in-patient care; and (4) continuous or crisis care. *See* 42 C.F.R. § 418.302.

23.    Routine home care is the most common. Medicare reimburses the hospice at the routine home care rate for each day a beneficiary is under care and not in need of one of the other levels of care. The rate for routine home care in 2014 is

$156.06 per day. Respite care is short-term in-patient care provided when necessary to relieve a beneficiary's normal caregiver(s). The rate for respite care in 2014 is $161.42 per day. General in-patient ("GIP") care is sometimes required for pain control and symptom management. GIP care is not equivalent to hospital level of care but it is provided in an in-patient facility, such as a skilled nursing facility. It is the second most expensive level of hospice care. The rate for GIP care in 2014 is $694.19 per day. Continuous care or crisis care is the highest level of hospice care. The rate for continuous care in 2014 is $910.78 per day or $37.95 per hour. Continuous care goes beyond palliative care and provides for nursing care, covered on a continuous basis for as much as 24 hours a day. *See* 42 C.F.R. § 418.204(a). A period of crisis is a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms. *Id.* It is provided to a patient during a "brief period of crisis," and only as necessary to allow the patient to remain at his or her residence. *See* 42 C.F.R. § 418.302(b)(2). During periods of crisis, federal law requires that the care rendered "must be predominantly nursing care." 42 C.F.R. § 418.204(a). Nursing care is care that is provided by a registered nurse (RN), licensed practical nurse (LPN), or a nurse practitioner (NP). *See* Medicare Benefit Policy Manual, Chapter 9, Sec. 40.1.1. and 40.2.1. "Predominantly," within the context of 42 C.F.R. § 418.204(a)'s continuous care provision, means that greater

than 50% of the hours of care provided within a 24-hour period are provided by an RN, LPN, or NP.

24.    If the number of hours of care provided by a home health aide or other person that is not an RN, LPN, or NP, exceeds the number of hours provided by such a licensed medical professional, then the hospice care should be claimed and paid for at the routine home care rate ($156.06 per day) and not at the continuous care rate ($910.78 per day).  A continuous home care day is defined as follows: "a day on which an individual who has elected to receive hospice care is not in an inpatient facility and receives hospice care consisting predominantly of nursing care on a continuous basis at home. Home health aide (also known as a hospice aide) or homemaker services or both may also be provided on a continuous basis. Continuous home care is only furnished during brief periods of crisis as described in § 418.204(a) and only as necessary to maintain the terminally ill patient at home." 42 C.F.R. § 418.302.  Importantly, if the crisis care lasts fewer than 8 hours on a given day then the provider should be paid the routine home care rate and not the continuous care rate. 42 C.F.R. § 418.302(e)(3). The amount that Medicare reimburses on a continuous care day varies depending on the number of hours of continuous services provided. The continuous home care rate is divided by 24 to yield an hourly rate ($37.95 per hour). The number of hours of continuous care provided during a

continuous home care day is then multiplied by the hourly rate to yield the continuous home care payment for that day. A minimum of 8 hours of care must be furnished on a particular day to qualify for the continuous home care rate. 42 C.F.R § 418.302(e)(4).

## II.   <u>Georgia Hospice Medicaid Regulations</u>

25.    Under Georgia's Medicaid hospice regulations, a hospice provider will only receive reimbursement for hospice services provided to Medicaid beneficiaries if, among others, the following requirements are met:

(a)   the patient has a referral from a physician who has personally evaluated the patient and diagnosed the patient as terminally ill, where the medical prognosis is less than six months of life if the terminal illness takes its normal course, and in need of hospice care;

(b)   the patient has received from the hospice an initial assessment, performed by an appropriate representative of the hospice care team, that reflects a reasonable expectation that the patient's medical, nursing, and psychological needs can be met adequately by the hospice and further reflects that the patient has a need for and can benefit from hospice care; and

(c)   the patient has been certified in writing by the hospice to have an anticipated life expectancy of six months or less if the terminal illness takes its normal course.

Ga. Comp. R. & Regs. 290-9-43-.14.

26.    In addition, the hospice must develop a plan of care within 24 hours of admission to hospice.  The plan of care must be based on the initial assessment with

input from a physician or registered nurse. *Id.*

27.    Moreover, Georgia requires hospice providers to designate a hospice care team for each patient. Ga. Comp. R. & Regs. 290-9-43-.15.

28.    The care team must be comprised of individuals who provide or supervise the provision of hospice services. *Id.* The care team shall consist of at least the following: (a) a physician; (b) a registered nurse; (c) a social worker; (d) a member of the clergy or other counselor; and (e) volunteers. *Id.* The appropriate care team members must provide a comprehensive assessment, as dictated by the patient's needs, no later than seven days after admission. *Id.* The comprehensive assessment must include a medical, nursing, psychosocial, and spiritual evaluations of the patient. *Id.*

29.    Based on the results of the patient's comprehensive assessment, the hospice care team shall establish and maintain a written plan of care for each hospice patient prior to providing care. *Id.*

30.    The hospice care team must also provide and supervise hospice care and services in accordance with accepted standards of care and the plan of care. *Id.* The plan of care must detail the scope and frequency of the services needed to meet the medical needs of the patient. *Id.*

31.    Moreover, the hospice care team must also review, as a group, and

update each patient's plan of care as the patient's condition changes and as additional services are identified. *Id.* All reviews and updates must be documented in the patient's medical record. *Id.* This documentation must include a record of the participating members of the hospice care team as well as evidence of the attending physician's opportunity to review and approve any revisions to the plan of care. *Id.* In the absence of the attending physician's written approval of the revised plan of care, the revised plan of care must have the written approval of the hospice's medical director. *Id.*

32.    In addition, Georgia requires that all hospice providers have a medical director. Ga. Comp. R. & Regs. 290-9-43-.17. The medical director must be a physician licensed to practice in Georgia who has at least one year of documented experience on a hospice care team or in another setting managing the care of terminally ill patients. *Id.* All medical services must be provided under the direction of the medical director. *Id.* Hospice providers may also appoint additional hospice physicians to assist the medical director in the performance of his or her duties. *Id.*

33.    Among other requirements, the medical director must:

(a)    be either an employee of the hospice or work under a written agreement with the hospice;

(b)    be responsible for the direction and quality of the medical component of the care provided to patients by the hospice care team, including designating a licensed physician, employed by the

hospice or working under a written agreement, to act on his or her behalf in the medical director's absence;

(c)   Participate in the interdisciplinary plan of care reviews, patient case review conferences, comprehensive patient assessment and reassessment, and the quality improvement and utilization reviews;

(d)   Review the clinical material of the patient's attending physician that documents basic disease process, prescribed medicines, assessment of patient's health at time of entry and the drug regimen;

(e)   Ensure that each patient receives a face-to-face assessment, by either the medical director or the patient's attending physician, or is measured by a generally accepted life-expectancy predictability scale for continued admission eligibility at least every six months, as documented by a written certification from the medical director or the patient's attending physician that includes: (1) a statement that the individual's medical prognosis is for a life expectancy of six months or less if the terminal illness runs its natural course; (2) a specific current clinical finding and other documentation supporting a life expectancy of six months or less if the terminal illness takes its natural course; and (3) the signature of the physician; and

(f)   communicate with each patient's attending physician and act as a consultant to attending physicians and other members of the hospice care team.

*Id.*

## III.   **Defendants' Fraudulent Conduct**

### A.   **False Claims Act Violations**

34.   Defendants have engaged in longstanding fraudulent conduct in violation of the laws and regulations stated above, resulting in substantial actual loss

to the Government.    Specifically, and as already noted, above, Defendants: (i) offered and paid kickbacks in exchange for patient referrals in violation of the AKS and the Stark Law; (ii) provided and billed the Government for continuous care to patients who were not qualified to receive such care; and (iii) improperly provided inducements to patients and their families to ensure their cooperation and falsified documents to conceal their fraud.

### 1.    Homestead Offered and Paid Kickbacks in Violation of the AKS and the Stark Law

35.    Defendant Homestead (acting at the direction of defendant Abdsharafat) provides kickbacks in the form of cash, medical directorships, gifts, hosting parties, travel (*e.g.*, a cruise for referring physicians), providing staff Certified Nursing Assistants ("CNAs") to third-party facilities, and providing music and entertainment such as belly dancers to recruit patients, build census and increase revenue.    These kickbacks are discussed below.

36.    First, Homestead ostensibly paid physicians to serve as "medical directors" or "associate directors," but in actuality this was nothing but a front for kickbacks for patient referrals.    Specifically, according to Relator 2, Defendants paid each physician $1,500-$2,500 a month as independent contractors (the physicians were paid using Form 1099-MISC).    According to Relator 2, however, these physicians performed no services for Homestead.    Rather, they merely referred

patients to Homestead and would sometimes appear to treat their own patients that they had referred to Homestead. These Georgia-based physicians included James Michael Rogan, M.D., Saurabh D. Desai, M.D., Terence Andrew Frinks, M.D., and Otto C. Goyco, M.D.

37. Relator 1 confirms that Defendants paid physicians for referrals, and explains other ways in which Defendants provided benefits and inducements to physicians in exchange for referrals.

38. For example, Relator 1 states that defendant Abdsharafat would regularly throw parties and events for these physicians. These parties – which took place in 2011, 2012, and 2013 – included food, alcohol, and entertainment, and took place in her home, at horseracing events, and on cruise ships. These events were often "ticketed" events. According to Relator 2, he observed defendant Abdsharafat paying Dr. Rogan reimbursements for tickets that he had purchased. Similarly, Relator 2 states that he attended a cruise party aboard a ship and that Homestead paid for its "bogus" medical directors – including Drs. Rogan and Desai – to attend, along with a host of other physicians.

39. Defendants also paid kickbacks for referrals by providing "free" CNAs to assisted living centers that agreed to refer patients to Homestead. For example, according to Relator 2, Homestead had a deal with an assisted living center in

Cartersville, GA whereby Homestead would provide a CNA, free of charge for 8 hours a day, in exchange for the referral of 8 patients to Homestead. Relator 2 observed that some assisted living centers would receive multiple CNAs for multiple days a week and that Homestead would also provide music and entertainment to assisted living centers in exchange for patient referrals.

### 2. Homestead Provided and Billed the Government For Services to Unqualified Patients and Improperly Induced Patients to Use Homestead

40. Defendant Homestead (acting at the direction of defendant Abdsharafat) regularly provided and billed the Government for services for unqualified patients. Specifically, according to Relator 2, Homestead regularly provides continuous care to its patients regardless of whether they actually qualify for such care.

41. As noted, above, there are four levels of care in hospice: routine home care, general inpatient care, continuous care, and respite care, reimbursed at $156.06 per day, $694.19 per day, $910.78 per day, and $161.42 per day, respectively. According to NHPCO, routine home care is provided (in 2012) 96.5% of the time, while continuous care was provided 0.5% of the time. This is not surprising, as the criteria for continuous care are restrictive, and require that a patient suffer an acute symptom that is not manageable with routine care and that a registered nurse provide

care for the patient more than 50% of the time.

42.    According to Relator 2, senior personnel at Homestead were unaware that the reimbursement rate for continuous care was so high relative to the alternatives until they started building up Homestead's Cartersville, GA office. He states that once Homestead learned of the disparity in reimbursement, the Cartersville office became a continuous care "machine." He further states that he observed the Cartersville office billing for continuous care "on every patient." Relator 2 brought this to the attention of other personnel at Homestead, including Amanda McKessic (the administrative assistant for Cartersville) and Sol Rozai, Homestead's Chief Operating Officer. Ms. McKessic and Mr. Rozai informed Relator 2 that they were billing for continuous care "all the time" and that they were "astonished" at how much money they were making as a result.

43.    This conduct is confirmed by Relator 1, who states that not only was Homestead billing for continuous care at all times, but that it was also directing its marketers to market continuous care to patients as an incentive to go with Homestead for their hospice care. According to Relator 1, Homestead falsely told patients entering hospice care that they were eligible for continuous care even when they were not, and that if they hired Homestead, they would receive it. Relator 1 also states that Homestead was regularly billing for continuous care that was not

provided. Further, according to Relator 2, Homestead would induce patients to retain Homestead by promising to pay for all of the patient's medications – even those not associated with the diagnosis giving rise to the need for hospice care. Relator 2 personally observed defendant Abdsharafat paying for, or causing Homestead to pay for, such medications.

### 3.   Data Provided By Relators Confirms the Fraud

44.   Relators provided documentation regarding patient census and physician referrals that confirm the fraud.

45.   First, Homestead's patient census grew at a phenomenal rate in conjunction with the number of referrals provided by its medical directors and associate directors. This gives rise to a strong inference that the appointment of directors was tied to referrals from those same directors.

46.   Relator 2 provided a document which confirms total patient census at year end for 2008 was 62, patient census at year end for 2009 was 106, and the patient census for the first six months of 2010 was 140. The same document attributes the growth to physician referrals and skilled nursing facility referrals. Relator 2 also provided another document which shows that total patient census at the end of 2011 was 237. Relator 1 provided a document which confirms that the total number of admissions for Homestead in Georgia from January 1, 2012 until

August 18, 2012 was at least 143. Accordingly, patient admissions in Georgia, alone, for the first eight months of 2012 were greater than Homestead's entire patient census for 2010.

47.    Not surprisingly, physician referrals from Homestead medical directors and associate directors were also rapidly increasing.

48.    A "comprehensive referral log" provided by Relator 2 shows that Dr. Desai referred just 8 patients to Homestead in 2009, and 9 patients to Homestead in 2010. In 2012, however, Dr. Desai referred 181 patients to Homestead – over 22 times as many as he did in 2009. Similarly, in 2009 Dr. Rogan referred 26 patients to Homestead. In 2012, however, Dr. Rogan referred 174 patients to Homestead – over 6 times as many as he did in 2009.[1]

## COUNT I
### (False Claims Act 31 U.S.C. § 3729(a))

49.    Relators repeat each allegation in each of the preceding paragraphs of this Complaint with the same force and effect as if set forth herein.

50.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare and Medicaid by: (i) offering and

---

[1] The number of referrals to Homestead from Dr. Frinks increased, though not as dramatically, from 14 in 2009 to 28 in 2012.

paying kickbacks in exchange for patient referrals in violation of the Anti-Kickback Statute and the Stark Law; (ii) providing and billing the Government for continuous care to patients who are not qualified to receive such care; and (iii) improperly providing inducements to patients and their families to ensure their cooperation and falsifying documents to conceal their fraud.

51.    By virtue of the acts described above, Defendants have violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

52.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment,

by engaging in the above-described conduct.

53.    By reason of the foregoing, the Government has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II
**(Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq.*)**

54.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

55.    This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq.*

56.    The Georgia False Medicaid Claims Act imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and

knowingly delivers, or causes to be delivered, less of such property or money;

(5) Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

O.C.G.A. § 49-4-168.1.

57.    Any person who violates the Georgia False Medicaid Claims Act "shall be liable to the State of Georgia for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person." *Id.*

58.    Defendants violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia

by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

59.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by Defendants, healthcare providers and third party payers in connection therewith.

60.    Compliance with the Anti-Kickback Statute, Stark Law and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes was also a condition of payment of claims submitted to the State of Georgia.

61.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by Defendants, healthcare providers and third party payers in connection with that conduct.

62.    As a result of Defendants' violations of the Georgia False Medicaid

Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

63.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of themselves and the State of Georgia.

64.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

## JURY TRIAL DEMANDED

65.     Relators demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(a)     As the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, provides:

   i.     that the Government be awarded damages in the amount of three times the damages sustained by the Government because of the false claims alleged within this Complaint;

ii.    that civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the Government and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

iii.    that attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case be awarded;

iv.    that Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

v.    that this Court order such other and further relief as it deems proper.

(b)    As the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq.*, provides:

i.    that the State of Georgia be awarded damages in the amount of three times the amount of actual damages sustained by the State of Georgia because of the false claims alleged within this Complaint;

ii.    that civil penalties of not less than $5,500 and not more than $11,000 be imposed for each false claim that Defendants presented or caused to be presented to the State of Georgia;

iii.    prejudgment interest;

31

iv.    that Relators be awarded the maximum amount allowed to them

pursuant to Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-

168, and/or any other applicable provision of law;

v.    that attorneys' fees, costs, and expenses that Relators necessarily

incurred in bringing and pressing this case be awarded; and

vi.    that this Court order such other and further relief as it deems proper.

DATED: October 14, 2015                    Respectfully submitted,


**Law Offices of David A. Bain, LLC**

David A. Bain
Georgia Bar No. 032449
1050 Promenade II
1230 Peachtree St. NE
Atlanta, GA 30309
Telephone: (404) 724-9990
Facsimile: (404) 724-9986
dbain@bain-law.com

**THE WEISER LAW FIRM, P.C.**
Christopher L. Nelson
James M. Ficaro
Ross M. Wolfe
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

*Attorneys for Relators*